KREIDER et al. v. COLE.

(Circuit Court of Appeals, Third Circuit. January 11, 1907.)

No. 13.

1. COURTS—FEDERAL COURTS—JURISDICTION—DETERMINATION OF QUESTION.

In a suit in the federal courts, a question of jurisdiction is fundamental, and may be raised at any time, in any mode, and at every step in the proceedings, either by the court of its own motion or by the parties, and such investigation may be instituted as shall be necessary to establish or defeat the court's jurisdiction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 818.]

2. SAME—CAUSE OF ACTION—TRANSFER.

Act Cong. March 3, 1875, c. 137, § 5, 18 Stat. 472 [U. S. Comp. St. 1901, p. 511], provides that if a suit brought in or removed to a Circuit Court of the United States does not involve a controversy properly within its jurisdiction, or if the parties have been improperly joined to create a case cognizable or removable under the act, the court shall dismiss the suit or remand it, as justice may require. *Held* that, where persons largely interested in a Pennsylvania corporation, desiring to institute a suit in the federal courts of Pennsylvania for a receiver, caused certain bonds and stock of little or no value to be assigned to a citizen of New Jersey, who was a mere stenographer in the office of one of the corporation's attorneys, for no other consideration than that he should sign the bill, which the corporation's attorneys thereafter filed, such transaction constituted a fraud on the court's jurisdiction sufficient to defeat it, though the assignment was absolute.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 862.]

Buffington, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 140 Fed. 944.

T. R. White, for appellants.

Francis S. Brown and Ira Jewell Williams, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the Circuit Court for the Eastern District of Pennsylvania, denying the prayer of the appellants, as interveners, in a certain suit in equity, wherein Stirling W. Cole was complainant and the Philadelphia & Easton Street Railway Company was defendant, that the said bill in said suit be dismissed for want of jurisdiction, and the appointment of receivers therein vacated. The bill in the original suit was filed by Stirling W. Cole, as complainant, September 23, 1905. On the same day, an appearance having been entered by the Philadelphia & Easton Railway Company, the defendant, an appointment was made, by consent of its counsel, of the Excelsior Trust & Saving Fund Company as temporary receiver. On October 4, 1905, an answer was filed by said company, admitting the facts set forth in the bill, and submitting itself to the order of the court in the premises.

On the same day a petition was filed by the appellants, as receivers of H. M. Herbert & Co., who, it was alleged, had been creditors of the said defendant company, praying that they be allowed to inter-

vene. The petition set out an indebtedness of the said railway company to H. M. Herbert & Co., to a large amount, and alleged that the appointment of a receiver, on account of insolvency alone, was improper and unauthorized; that the bill had been filed by the procurement and direction of certain directors of the company, in whose interest the receiver, beforehand agreed upon by said directors, had been appointed. It also states that the interveners, at about the time of the filing of the complainant's bill in the court below, had filed a bill in the common pleas court of the state of Pennsylvania, in and for Bucks county, charging improper conduct on the part of the board of directors of the defendant corporation, and praying for divers relief and also for the appointment of a receiver or receivers of the said railway company and its property. A copy of the said bill is annexed to the petition. From it, it appears that the same was filed on Monday, September 25th, the bill of complainant in the court below having been filed on Saturday, September 23d. The petition avers that the said bill in the state court was duly served upon said company, and service thereof accepted by counsel for said company, in open court, where, at the same time a motion was made for the appointment of a receiver, to be heard on October 2d; that the bill in equity in this cause was filed in the court below, accompanied by an acceptance of service by an attorney who is in the office of the counsel who appeared for the plaintiff, and on the day of its filing, a receiver was appointed, with the consent of said counsel, as above stated. The petition also avers that the bill was filed collusively, in that the—

"Petitioners are informed and upon information believe and aver that the plaintiff in this cause is a stenographer in the office of the prosecutor of the pleas in the city of Camden, state of New Jersey. He claims to own one bond of the issue of July 2, 1901, and one of the issue of November 12, 1904, being bond No. 745, which H. M. Herbert & Co. sold in July, 1904, to A. C. Patterson, president of the Excelsior Trust & Saving Fund Company, and certain shares of capital stock. Your petitioners believe and aver that the said plaintiff holds these securities merely colorably, for the purpose of giving an apparent jurisdiction of the case to this honorable court."

The petition therefore prayed that the bill be dismissed, and the appointment of the temporary receiver be vacated.

On October 14, 1905, the petition of Amos Johnson, who averred that he was a citizen of the state of New Jersey, and asked for leave to intervene as a creditor and stockholder of the defendant company, was filed; and on October 16, 1905, the petition of John I. Beggs, who averred that he was a citizen of the state of Wisconsin, and, as trustee in bankruptcy, a creditor of the said defendant company, was filed, asking leave to intervene as party plaintiff, both petitions asking leave to join in the allegations and prayers of the bill. On December 5, 1905, a decree was entered, appointing receivers and granting the prayer of both of the said petitioners. On October 5, 1905, a rule was granted to the appellants, to take depositions in the matter of the want of jurisdiction, alleged in their said petition. After the taking of the testimony, to wit, on October 25, 1905, an answer by Stirling W. Cole, the appellee, was filed to the petition of the appellants, denying and controverting the allegations of their petition, and

asking that the same should be dismissed. On November 6, 1905, the court below filed an opinion on the issues joined between the defendant and the appellants, as interveners, refusing to dismiss the bill of the complainant-appellee, and confirming the appointment of the temporary receiver.

The learned judge, after considering the evidence, taken on the rule granted the petitioners for that purpose, sustained the jurisdiction of the court below, saying in his opinion:

"The evidence shows that the bonds and stock were transferred to the plaintiff, who is a non-resident of this district, for the purpose of filing this bill. It also shows that he is the absolute owner, as there is no agreement that he shall collect for the transferrors. or that they have the least interest in the securities. This being the case, there is no question but what this court has jurisdiction. Of course, where property has been colorably and collusively transferred to a non-resident for the sole purpose of giving the federal courts jurisdiction, and where the nominal parties are not the real parties and the real owners of the property in dispute, the federal courts will dismiss the case when that fact is made to appear, but the court will not inquire into the intention or motive of the parties when it is established that the nominal parties are the real parties, even though there be no consideration for the property transferred, so long as they are the real bona fide owners and are not merely holding it for the sole and only purpose of enabling them to bring suit in the United States courts."

He then quotes the language of Justice Harlan, in the case of Lehigh Mining & Mfg. Co. v. Kelly, 160 U. S. 336, 16 Sup. Ct. 311 (40 L. Ed. 444), and thus concludes:

"In this case, it is established that the grantor or vendor of the stock and bonds has not reserved, nor does he claim a right or power to compel or require a reconveyance or return to him of the property, and we think this court has jurisdiction."

The specifications of error in the decree appealed from, challenge the correctness of this conclusion of the court below, upon the evidence disclosed in the record.

A question of jurisdiction is fundamental and underlies all other questions arising in the course of a litigation. Such a question may be raised at any time, in any mode, and at any stage, as every step taken in the progress of a cause is an assertion of jurisdiction, and the court may, of its own motion, make the objection or institute such investigation as may be necessary to establish or defeat it. This is especially true of the federal courts, as being courts of limited or statutory jurisdiction. The reasons for extending judicial power of the United States to controversies between citizens of different states, are historical and need not be now rehearsed. It suffices to say that the federal courts have, from the beginning, jealously guarded against all attempts to found jurisdiction upon controversies that were not really and substantially such between citizens of different states. Butler v. Farnsworth, 4 Wash. C. C. 101, Fed. Cas. No. 2,240.

The facts upon which the jurisdiction in the present case is challenged were established by the testimony of Stirling W. Cole, the complainant therein, upon whose testimony alone the appellant relies. We have accordingly carefully examined this testimony, the important parts of which we quote from the record, as follows:

"By Mr. Page: Q. Where do you reside? A. No. 116 North Sixth street, Camden, N. J. Q. What is your business? A. Stenographer. Q. To whom? A. Frank T. Lloyd, prosecutor of the pleas, Camden, N. J. Q. How long have you resided in Camden, and how long have you been employed by Mr. Lloyd? A. I have resided there about three and one-half years, and have always been employed by him ever since I came to Camden. Q. How old are you now? A. Twenty-two last March. Q. There has been a bill in equity filed here, copy of which I hand you. Was this filed on your behalf? A. Yes, sir. Q. By your direction? A. Yes, sir. Q. Did you take the affidavit which is at the back of it? A. I did; yes, sir. Q. Did you take it on the 23d of June, 1905? A. No. Q. When did you take it? A. To-day. I took it originally, to one like this, about two or three weeks ago; I won't be sure of the date. Q. See if you can recall the date you took that oath. A. I don't even remember the day of the week. Q. In what week was it? A. I should say, just thinking back, in the neighborhood of two or three weeks ago. Q. Say three weeks ago, where would that bring you? A. That would bring it back in the neighborhood of the 18th or 20th, but I am absolutely unable to say accurately. Q. Perhaps you might fix it by the events surrounding it. Where was the affidavit taken? A. There was one affidavit taken in Mr. Lloyd's office, and one was taken in Mr. Williams' office. Q. Were they both taken the same day? A. The two were taken on the same day. Q. When you say there were two, what do you mean; was one like this to the bill, or was it to an affidavit or what? A. One was an affidavit to the whole bill: was in the form of an affidavit to which I swore, and then there was a small affidavit to which I also swore. Q. Did you swear to a bill at that time? A. I did. Q. Then did you take two oaths or three oaths? A. I took two oaths on that day. Q. One was at Mr. Lloyd's office and one at Simpson & Brown's office? A. That is right. (Witness shown paper.) Q. Is that the affidavit you swore to? A. That is apparently a carbon copy of the affidavit. Q. You swore to that? A. Yes. Q. Was this done in Mr. Lloyd's office? A. No; in Mr. Williams' office. Q. The bill then was sworn to in Mr. Lloyd's office? A. A small affidavit on a page at the back of the bill was sworn to at Mr. Lloyd's office. Q. Was the bill attached to it? A. Yes, sir; if I remember correctly. Q. What time in the day, in Mr. Lloyd's office, did you swear to the affidavit? A. In the morning. Q. At what time did you swear to the bill? A. In Mr. Williams' office; it was in the forenoon, or very nearly 12 o'clock, probably a little after 12. I think I left Camden about 12. Q. Having previously sworn to the affidavit in Camden? A. Yes, sir. Q. In both the bill and affidavit it is asserted that you own two bonds of the Philadelphia & Easton Railway Company? A. Yes, sir. Q. And 100 shares of stock? A. Yes, sir. Q. Will you be good enough to tell me when you obtained possession of this stock and these bonds? A. I obtained possession of one bond at the time I swore to the two first affidavits, and the stock and the remaining bond to-day, but they were taken charge of by Mr. Williams for me on the day on which I made the original affidavit. Mr. Williams held them for me as my counsel. Q. Did you ever have possession of these securities prior to the time which you have now stated? A. What do you mean by the time now stated? Q. You state one of these bonds was placed by you with Mr. Williams as your counsel at the time you signed the bill, and you said you got the other securities to-day. A. Actual and physical possession of them, but at the time I signed the original affidavit, it was understood they belonged to me, but they were left in Mr. Williams' possession. Q. When you say it was understood, do you mean to say you understood, or who understood? A. I understood. Q. Before that bill was filed and Mr. Williams received charge of one of these bonds for you, had you paid a single penny for that bond? A. I had not. Q. Had you paid a single penny for the other bond or the stock? A. No. Q. When was it that you first paid for these bonds and this stock? A. There was no actual money paid. Q. From whom did you obtain them? A. From Mr. Williams. Q. Mr. Ira Jewell Williams? A. Yes, sir. Q. One of these bonds, you say, was of the old issue, No. 745, and the bond of the new issue was No. 841. Which bond did you get when you first signed the bill? A. I do not recall. I did not take notice of the numbers at that time. Q. Was it a bond of the old issue or the new issue, the issue of 1901 or 1904? A. I am unable to state that either. Q. Did you have the stock in your hands at all, the certificate of stock? A. Yes, sir.

Q. In whose name was the certificate made out? A. In the name of one Rosenberger, I believe. Q. You do not know him, do you? A. I don't know him personally. Q. You did not buy it from him? A. No. Q. You made no bargain to buy it from him? A. I did not. Q. In fact you did not have anything to do with getting it from him? A. Not from Mr. Rosenberger; no, sir. Q. Has the stock ever been transferred to you? A. I believe it is transferred in blank from Mr. Rosenberger in blank. Q. You mean indorsed on the back? A. Yes, sir. Q. That is, the power of attorney on the back is indorsed in blank? A. Yes. Q. Your name as a stockholder does not appear on the certificate? A. No, sir. Q. And so far as you know, your name does not appear in the stock book and you have never requested that it should be put in your name? A. I have never requested that it be transferred. Q. Did you or did you not direct or request Mr. Williams or anybody else to purchase these bonds and this stock for you? A. I did not directly request it; no, sir. Q. As you only received that bond, one of the two bonds you speak of in your bill, and left it in the hands of Mr. Williams, never having seen it before, that being the day you signed the bill, would you be good enough to tell me why you filed a bill against the Philadelphia & Easton Railway Company, not being up to that time interested in the company at all? (Objected to by Mr. Williams.) A. I filed the bill in consideration of the bonds being transferred to me; they were to be transferred to me in consideration of the filing of the bill. Q. Is that true of the stock also? A. Yes, sir. Q. So that, if I understand you, the sole consideration that you gave for these securities was the filing of this bill? A. Yes, sir. Q. Was it after your work on Saturday that you came over to Mr. Williams' office to do this thing? A. I think it was on Friday; I don't think it was a Saturday. Upon looking again, I should say it was September 22d. Q. But are you not yet positive? A. I am not exactly positive, but I am pretty sure it was on a Friday. Q. After you came over, did you direct the bill to be filed? A. I did not say in so many words to file the bill, but the bill speaks for itself in that respect, I should think. Q. Would you be good enough to tell me with whom you made this arrangement, whereby the consideration of your action was the receipt of these securities? A. With Mr. Williams. Q. May I ask you when you entered into that arrangement? How long before you came to his office? A. At his office. Q. Was it at that time or some time prior to the time when you swore to the bill? A. At the time I swore to the bill. Q. Who brought you the affidavit to Mr. Lloyd's office, which you took? A. It came by mail. Q. Was there a request in that that you should take affidavit to that bill? (Objected to by Mr. Williams.) A. I think there was. Q. And that was the first time your attention was drawn to the consideration of the question? A. That was the first time it was directly drawn to the question. Q. You have had no correspondence or arrangement with regard to your action until the affidavit was presented to you at Mr. Lloyd's? A. None. * * * Q. Mr. Cole, having entered into this arrangement, as suggested by Mr. Williams in his letter, and having come over to the office to sign the bill and swear to it, what arrangement did you make, if any, with regard to the costs, expenses, etc.? A. I made no arrangements whatever. Q. Did you or did you not expect to pay for the costs of this litigation? (Objected to by Mr. Williams.) A. No, I did not."

Upon cross-examination, Mr. Cole states that, when he swore to the bill in Mr. Williams' office, one of the counsel for the defendant corporation, a certain Mr. Lugar, whom he had never met, but who, he was told, was secretary and general manager of the defendant corporation, informed him as to the general condition of the road, and upon that information he swore to the averments of the bill. From this, it is apparent that the bill was filed at the instance of the corporation itself, or at least of some of its managers, Mr. Cole's appearance as plaintiff having been procured by its general counsel, who filed the bill in his name.

Apart from the requirements of the statute presently referred to, we think these facts, testified to by the plaintiff himself, would have fully

justified the court below in dismissing the bill, on the ground that it had been made to appear by the plaintiff's own statement, that there was no real controversy between him and the defendant corporation, that his interest was a nominal one, and that the real interest was in those who controlled the corporation defendant and were in large part its stockholders and creditors. The results of granting the prayers of the bill and the appointment of the receivers would be substantially, if not altogether, for the benefit of these controlling creditors and stockholders, and infinitesimally, if at all, for the benefit of the nominal plaintiff. The real interest was in, and the real controversy was between, citizens of the state of Pennsylvania, and neither the Constitution nor the judiciary law framed in pursuance thereof, can or should be so construed as to permit such controversies to be justiciable in the federal courts, or the limitations upon their jurisdiction to be evaded by artifices so transparent as those disclosed in the testimony above recited. That such jurisdiction cannot be created by such devices, had been decided by the Supreme Court long prior to the enactment of the statute of March 3, 1875. The mandatory provisions of section 5 of that act (Act March 3, 1875, c. 137, 18 Stat. 472 [U. S. Comp. St. 1901, p. 511]), set at rest any doubts that may have been entertained, as to how far courts might go in putting a stop to all "collusive shifts and contrivances for giving such jurisdiction." The act is entitled "An act to determine the jurisdiction of Circuit Courts of the United States," etc., and the fifth section reads, in part, as follows:

"That if, in any suit commenced in a Circuit Court, or removed from a state court to a Circuit Court of the United States, it shall appear to the satisfaction of the said Circuit Court, at any time after such suit has been brought or removed thereto, that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said Circuit Court, or that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this act, the said circuit court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed, as justice may require."

It is hard to conceive how any case would more certainly be within the meaning of this language than the one at bar. It is apparent from the testimony which we have quoted, that not only was there no real and substantial controversy between the plaintiff, Stirling W. Cole, and the defendant corporation, but that the complainant was made a party to the suit collusively, and by the direct procurement of those interested in the defendant corporation. Counsel for complainant frankly avow that the bonds and stock were transferred to Cole for the purpose of creating a jurisdiction on the ground of diverse citizenship, and were so transferred in consideration of his signing the bill for that purpose. They contend, however, that the transfer of these two bonds and the shares of stock was absolute on its face, leaving no interest therein in the grantors, and accompanied by no trust in their favor, and they cite the cases of Lehigh Mining & Mfg. Co. v. Kelly, supra, and South Dakota v. North Carolina, 192 U. S. 286, 24 Sup. Ct. 291, 48 L. Ed. 437, as authority for the proposition that, no matter for what motive such a transfer may be made, if ab-

solute on its face it cannot be challenged as insufficient to give jurisdiction. We do not think, however, that these cases support this proposition to the extent necessary to sustain jurisdiction on facts like those in the present case, or that either of them support a doctrine different from that stated by the Supreme Court in Dickerman v. No. Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423, also cited by the appellee, as follows:

"It is well settled that a mere colorable conveyance of property, for the purpose of vesting title in a non-resident and enabling him to bring suit in a federal court, will not confer jurisdiction; but if the conveyance appear to be a real transaction, the court will not, in deciding upon the question of jurisdiction, inquire into the motives which actuated the parties in making the conveyance."

The case of the Lehigh Mining & Mfg. Co. v. Kelly, which seems to have been relied upon by the learned judge of the court below, was a case in which the tract of land in controversy was owned by the Virginia Coal & Iron Company, a corporation organized under the state of Virginia. In order to prosecute certain litigation against another citizen of Virginia, in reference to said land, the stockholders of the Virginia Coal & Iron Company organized the Lehigh Mining & Manufacturing Company, under the laws of the state of Pennsylvania; the land in controversy was then conveyed by the former company to the latter, thus vesting the title to the subject-matter of litigation in a citizen of Pennsylvania. Here was a complete and effective transfer of title, absolute on its face and leaving no interest whatever in the grantor, the old corporation. It is true that Judge Harlan used the language quoted in the opinion of the learned judge of the court below, to the effect that a citizen of one state, a bona fide purchaser of property, cannot be debarred of his privilege to maintain a suit in the Circuit Court of the United States against a citizen of another state, because of the "motive that induced his grantor to convey * * * provided such conveyance or such sale and delivery was a real transaction, without the grantor or vendor reserving or having a right or power to compel or require a reconveyance or return to him of the property in question." But this was a preliminary statement, evidently made to guard against its being thought that the court intended to sanction so extreme a proposition, as, that a bona fide purchaser of property, where the sale and delivery was a real transaction and not a collusive one, should be denounced as a fraud on the jurisdiction, simply because the motive for such transfer or conveyance was that the grantee might be able to bring a suit in a federal court. Certainly there is no such hard and fast rule, as would denounce every such case, irrespective of its circumstances. After thus guarding himself, however, Mr. Justice Harlan proceeds to the consideration of the case in hand, and in the course of his opinion says:

"The arrangement by which, without any valuable consideration, the stockholders of the Virginia corporation organized a Pennsylvania corporation and conveyed these lands to the new corporation for the express purpose—and no other purpose is stated or suggested—of creating a case for the federal court must be regarded as a mere device to give jurisdiction to a Circuit Court of the United States and as being, in law, a fraud upon that court, as well as a

wrong to the defendants. Such a device cannot receive our sanction. The court below properly declined to take cognizance of the case.

"This conclusion is a necessary result of the cases arising before the passage of the act of March 3, 1875, c. 137, 18 Stat. 470 [U. S. Comp. St. 1901, p. 508]. The fifth section of that act provides that if, in any suit commenced in a Circuit Court, it shall appear to the satisfaction of that court, at any time after such suit is brought, that it 'does not really and substantially involve a dispute or controversy properly within the jurisdiction of said Circuit Court, or that the parties have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable * * * under this act, the said Circuit Court shall proceed no further therein, but shall dismiss the suit.' This part of the act of 1875 was not superseded by the act of 1887, amended in 1888 (Act Aug. 13, 1888, c. 866, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508]). Its scope and effect were determined in Williams v. Nottawa, 104 U. S. 209, 211, 26 L. Ed. 719, and Morris v. Gilmer, 129 U. S. 315, 9 Sup. Ct. 289, 32 L. Ed. 690. In the first of those cases the court, referring to the act of 1875, said: 'In extending a long way the jurisdiction of the courts of the United States, Congress was specially careful to guard against the consequences of collusive transfers to make parties, and imposed the duty on the court, on its own motion, without waiting for the parties, to stop all further proceedings and dismiss the suit the moment anything of the kind appeared. This was for the protection of the court as well as parties against frauds upon its jurisdiction.'

"The organization of the Pennsylvania corporation and the conveyance to it by the Virginia corporation, for the sole purpose of creating a case cognizable by the Circuit Court of the United States is, in principle, somewhat like a removal from one state to another with a view only of invoking the jurisdiction of the federal court."

In Morris v. Gilmer, supra, it was decided that a removal from one state to another, for the purpose of enabling the person so moving to bring suit in the Circuit Court of the United States, was a fraud upon its jurisdiction, and the following language of Mr. Justice Washington, in Butler v. Farnsworth, supra, is quoted with approval:

"If the removal be for the purpose of committing a fraud upon the law, and to enable the party to avail himself of the jurisdiction of the federal courts, and that fact be made out by his acts, the court must pronounce that his removal was not with a bona fide intention of changing his domicile, however frequent and public his declarations to the contrary may have been."

Mr. Justice Harlan also cites with approval from the case of Farmington v. Pillsbury, 114 U. S. 138, 5 Sup. Ct. 807, 29 L. Ed. 114:

"It (the act of 1875) was intended to promote the ends of justice, and is equivalent to an express enactment by Congress that the Circuit Courts shall not have jurisdiction of suits which do not really and substantially involve a dispute or controversy of which they have cognizance, nor of suits in which the parties have been improperly or collusively made or joined for the purpose of creating a case cognizable under the act."

The facts in the case of South Dakota v. North Carolina, 192 U. S. 287, 24 Sup. Ct. 291, 48 L. Ed. 437, are such as to entirely distinguish it from the present case. These facts, briefly, are that certain persons were owners of the bonds of the state of North Carolina; that that state had for a long time defaulted. The holders of these bonds decided to donate a portion thereof to the state of South Dakota. The whole transaction, together with the purpose and motive thereof, are clearly set out in the letter of gift, addressed to the Treasurer of the state of South Dakota. It is as follows:

"Hon. Charles H. Burke—Dear Sir: The undersigned, one of the members of the firm of Schafer Bros., has decided, after consultation with the other holders of the second-mortgage bonds issued by the state of North Carolina, to donate ten of these bonds to the state of South Dakota. The holders of these bonds have waited for some thirty years in the hope that the state of North Carolina would realize the justice of their claims for the payment of these bonds. The bonds are all now about due, besides, of course, the coupons, which amount to some one hundred and seventy per cent. of the face of the bond. The holders of these bonds have been advised that they cannot maintain a suit against the state of North Carolina on these bonds, but that such a suit can be maintained by a foreign state or by one of the United States. The owners of these bonds are mostly, if not entirely, persons who liberally give charity to the needy, the deserving and the unfortunate. These bonds can be used to great advantage by states or foreign governments; and the majority owners would prefer to use them in this way rather than take the trifle which is offered by the debtor. If your state should succeed in collecting these bonds, it would be the inclination of the owners of a majority of the total issue now outstanding to make additional donations to such governments as may be able to collect from the repudiating state, rather than accept the small pittance offered in settlement. The donors of these ten bonds would be pleased if the Legislature of South Dakota should apply the proceeds of these bonds to the State University or to some of its asylums or other charities.

"Very respectfully, Simon Schafer."

It also appears in the record of this case that the treasurer of the state of South Dakota was special'y authorized, by an act of the Legislature, to receive donations or gifts of money, bonds or choses in action, which, or the proceeds of which, when collected, were to be "appropriated to the State University or to the public schools, or to state charities, as may hereafter be directed by law." And the Attorney General is specially directed to bring suit in the name of the state, in any court of competent jurisdiction, state or federal, to collect or reduce in possession any such bonds or choses in action. The existence of this state law in South Dakota doubtless suggested the gift of these bonds to the state. It is to be observed that, not only was the gift out and out, but the consideration therefor was a "good one," in the sense that it was for a charitable use. No suit could be brought by any private holders, and the purpose is therefore avowed of turning over all these bonds for the charitable purposes indicated in the South Dakota law, because the donors preferred they should be so devoted, rather than accept the trivial sum offered in compromise by the state of North Carolina. If the state succeeded in its litigation, it alone was benefited, the donors being, from their situation, excluded from all participation therein. The state was to use its own discretion as to the collection by suit, and was to bear the entire cost of all litigation resorted to. It was as if the owners of these bonds had said: "Take these bonds; we can never collect them, and if you can make anything out of them, you may have it for the charitable purposes designated by the laws of your state." It is hardly worth while to pursue further the manifest difference between the facts of this case and those of the case with which we are here concerned. In any suit to be brought by the state of South Dakota against the state of North Carolina, the controversy between the parties to said suit would be real and substantial, and the parties thereto would not be improperly or collusively made, within the meaning of the act of 1875.

In Little v. Giles, 118 U. S. 596, 7 Sup. Ct. 32, 30 L. Ed. 269, the facts are somewhat complicated, but it is sufficient for our purpose to state that certain conveyances of land were made to Giles, bona fide and absolute on their face; that there was evidence to show that the purpose for which the conveyance was made was to enable Giles to invoke the jurisdiction of the federal court, on the ground of diverse citizenship. A bill in equity was filed in the state court against him, as well as others, to set aside conveyances prior to those to Giles himself. Giles procured a removal to the Circuit Court of the United States, on the ground of his diverse citizenship, and a motion to remand, made by the complainants on the ground that Giles was not a real party in interest, and that the transfer to him was collusive, was refused by the Circuit Court. In reversing this action of the Circuit Court, on appeal, Mr. Justice Bradley, delivering the opinion of the court, says:

"But we are also satisfied that the other ground is well taken—that the deed to Giles was collusively made for the mere purpose of giving jurisdiction to the courts of the United States; and that for this reason the case should have been remanded to the state court. We have examined the evidence on this subject with some care, and have come to that conclusion. Whether, under the former practice of the court, the deed to Giles, being binding between him and his grantors, Wheeler and Burr, would have been deemed sufficient to give jurisdiction to the Circuit Court, although made for the purpose of such jurisdiction, it is not necessary to inquire. We are satisfied that, by the act of 1875, Congress intended to introduce a rule that shall put a stop to all collusive shifts and contrivances for giving such jurisdiction. The language of the fifth section of that act is as follows:"

After quoting the section, Mr. Justice Bradley continues:

"Here the words 'really' and 'substantially,' and the expression 'improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable,' are very suggestive, and show that, by giving the Circuit Courts authority to dismiss or remand the cause at once, if these things are made to appear, it was the intent of Congress to prevent and put an end to all collusive arrangements made to give jurisdiction, where the parties really interested are citizens of the same state. Of course, where the interest of the nominal party is real, the fact that others are interested who are not necessary parties, and are not made parties, will not affect the jurisdiction of the Circuit Court; but when it is simulated and collusive, and created for the very purpose of giving jurisdiction, the courts should not hesitate to apply the wholesome provisions of the law."

The facts of the case before us, showing collusion for the purpose of obtaining jurisdiction, are much stronger than any of those cited or which we have examined, where jurisdiction was denied. The complainant, a young man 22 years of age and a stenographer in the office of certain attorneys in the city of Camden, N. J., just across the river from Philadelphia, is called upon to file a bill in equity in the Circuit Court of the United States for the Eastern District of Pennsylvania, against a street railway corporation of that state, and operated entirely within its territory, for the purpose of having a receiver thereof appointed. He testified that until the day on which the bill was filed, he knew nothing of the matter in controversy, but signed the bill merely at the request of counsel for the defendant corporation; that one of the bonds which it is asserted he owns, he re-

ceived after signing the affidavit to the bill, and the other he testifies he never saw, but that it was retained for him by one of the counsel for the railway company. The value of these bonds does not appear from anything contained in the record, but presumably neither the bonds nor stock of an insolvent corporation could have been anything near their par value. He testifies that he paid nothing for the transfer, the only consideration being that he should sign the bill as complainant; that it was understood that he was to be at no expense and be responsible for no costs. It is perfectly apparent that his interest in the suit was infinitesimal, in comparison with that of the directors of the corporation and other creditors, who held securities amounting to many hundreds of thousands of dollars, and at whose instance he became a party to the suit. After the signing of the bill, complainant, with his single bond, worth a few hundred dollars at the most, and the other in the possession of one of the counsel for the defendant corporation, to be held, as he says, for him, and his worthless certificate of stock, returns to the city of Camden without further concern or interest in the litigation, which is left entirely to the management of those who have the substantial interest in the controversy, and to the attorneys of the defendant corporation. If the contention of counsel for appellees is correct, that wherever, in a case like this, the transfer of property, for the avowed purpose of creating jurisdiction, is absolute on its face, there is a hard and fast rule that the jurisdiction thus obtained is valid and indefeasible, the purpose of the act of 1875 is, in large measure, if not altogether, defeated, and the jurisdiction of controversies may be forced away from the state courts, contrary to the manifest intention of the federal Constitution, and the laws made pursuant thereto, by simply placing, by an apparently out and out transfer, a portion of the property about which the proposed litigation is concerned, so small in value as to be negligible, in the hands of the citizen of another state. That this cannot be so, we think is apparent from a mere reading of the act of 1875, as well as of the decisions of the Supreme Court prior to its passage.

Not only must it appear that the controversy between the parties to the suit is real and substantial, but that the parties have not been collusively made or joined for the purpose of creating a case cognizable under the judiciary laws of the United States. If the action of the parties in this case be not declared collusive, within the meaning of the act of 1875, its provisions in that regard "would," to use the language of Mr. Justice Harlan in the Lehigh Mining Case, supra, "become of no practical value, and the dockets of the Circuit Courts of the United States would be crowded with suits of which neither the framers of the Constitution nor Congress ever intended they should take cognizance."

Appellees further contend that, however this may be, jurisdiction exists in this case by reason of the interventions, respectively, of Johnson and Beggs, as creditors and bondholders, both being bona fide residents of other states than the state of Pennsylvania, and that their diverse citizenship with the defendant is sufficient to sustain jurisdiction, even though, for the reasons stated, there was no valid

149 F.—42

jurisdiction at the time of the filing of the bill. This .proposition is manifestly unsound. Unless a valid jurisdiction has been asserted in the original suit, no intervention therein can be entertained. The right to intervene must be predicated primarily on the existence of a suit of which the court has jurisdiction. Where there is jurisdiction of a suit on the ground of diverse citizenship, intervention, if otherwise proper, may be allowed, even though the interveners be citizens of the same state as the defendant. In such cases, the jurisdiction is tested alone by the diverse citizenship existing at the time the bill was filed, "and it is to that point of time that the inquiry as to jurisdiction must necessarily be referred." Rouse v. Letcher, 156 U. S. 47, 15 Sup. Ct. 266, 39 L. Ed. 341.

The case, therefore, is remanded to the court below, with instructions to enter a decree dismissing the bill.